UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAN M. GAWLIK, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:20-cv-564 (SRU) |
| | : | |
| COMMISSIONER SCOTT SEMPLE, et al., | : | |
| Defendants. | : | |

**INITIAL REVIEW ORDER**

Jan M. Gawlik ("Gawlik"), proceeding *pro se*, brings this action under 42 U.S.C. §§ 1983, 1985, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, and three federal criminal statutes against Commissioner Scott Semple, District Administrator Angel Quiros, Director of Religious Services Reverend Dr. Charles Williams, Warden Scott Erfe, Lieutenant Czeremcha, Captain Watson, Correctional Officers Smith, Buckland, Brown, Parker and Cunningham, Nurse Chaniece Parker, Connecticut State Trooper Mejias, Lieutenant John B. Ceruti and Detective Edmund Vayan, and Commissioner of the Department of Emergency Services and Public Protection James Rovella. Gawlik additionally requests that I exercise supplemental jurisdiction over various state-law claims.

For the reasons set forth below, the complaint is **dismissed in part**.

## I.    Standard of Review

Under section 1915A of Title 28 of the United States Code, a district court must review civil complaints filed by incarcerated individuals and dismiss any portion of the complaint that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. That standard of

review "applies to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid a filing fee." *Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999))

Although detailed allegations are not required in order to survive initial review, a complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nevertheless, it is well-established that "the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (cleaned up); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.    Factual Background[1]

On March 26, 2018, Lieutenant Czeremcha called Gawlik to his office. *Id.* ¶ 21. When Gawlik reported to the office, he found six officers waiting outside. *Id.* Laughing, the officers told Gawlik that he was being sent to Administrative Segregation. *Id.* at ¶ 22. Gawlik asked Lieutenant Czeremcha why he was being sent to Administrative Segregation, but Lieutenant Czeremcha refused to answer. *Id.* at ¶ 23. One of the officers began videotaping Gawlik. *Id.*

Lieutenant Czeremcha told Gawlik to put his hands behind his back so that the other

---

[1] Gawlik, currently incarcerated at Cheshire Correctional Institution ("Cheshire"), was sentenced on January 9, 2015 to sixty years of incarceration by a judge in New Britain Superior Court. *See* State of Connecticut Judicial Branch, Criminal/Motor Vehicle Case Detail, *available at* https://www.jud2.ct.gov/crdockets/CaseDetailDisp.aspx?source=Pending&Key=25de74a7-77ac-42e7-b60c-fbc8c46cf21c. The events described in the complaint occurred at

officers could handcuff him. *Id.* at ¶ 24. Gawlik complied with the order. *Id*. Officer Buckland

pulled out handcuffs and handcuffed Gawlik's wrists so tightly that blood circulation was cut off.

*Id.* at ¶ 25. Gawlik explained to Officer Buckland that the cuffs were so tight that they were

cutting off circulation to his wrists and asked him to loosen the cuffs, but Officer Buckland

ignored him. *Id.* at ¶ 26. Gawlik again asked Lieutenant Czeremcha why he was being taken to

Administrative Segregation. *Id* at ¶ 27.  Lieutenant Czeremcha replied that Gawlik had

improperly "circumvented" the mail system by sending mail on behalf of another inmate. *Id.*

Gawlik admitted that he had sent mail on behalf of another inmate who could not afford to send

mail to his family but told Lieutenant Czeremcha that there was no rule in the Department of

Corrections Administrative Directives ("Administrative Directives") prohibiting him from

sending mail on behalf of someone else. *Id.*

Officer Brown then went behind Gawlik, and, despite the very tight handcuffs, used the

wrist-lock position to restrain Gawlik's wrists. *Id.* at ¶ 28. Officer Buckland went on Gawlik's

left side, and, using the wrist-lock escort position, twisted Gawlik's left hand upward so hard that

Gawlik felt that his wrist was going to break. *Id.* at ¶ 29. Gawlik was in so much pain that he

started to worry he might pass out. *Id.* at ¶ 30. Gawlik told Lieutenant Czeremcha his wrist felt

like it might break and that Officer Buckland was purposely hurting him. *Id.* at ¶ 31. Lieutenant

Czeremcha, however, ignored him and directed Officers Smith, Buckland, Brown, Parker, and

Cunningham to escort him to Administrative Segregation. *Id.* at ¶¶ 31-32.

Gawlik continued to plead with Lieutenant Czeremcha to direct Officer Buckland to stop

twisting his wrist because he was experiencing extreme pain. *Id.* at ¶ 33. Lieutenant Czeremcha

turned to the camera held by one of the other officers and stated, "for the record, there is no

---

Cheshire, after Gawlik had begun serving his sentence.   3

abnormal force used against plaintiff Gawlik." *Id.* The officers continued filming Gawlik until they arrived at the Administrative Segregation unit. *Id.* at ¶ 34.

When Gawlik arrived at the unit, the officers released his wrists and uncuffed him. *Id.* at ¶ 35. Gawlik looked at his hands and noticed that the top layer of skin had been peeled away by the handcuffs, and that his entire right hand had turned blue from lack of circulation. *Id.* at ¶ 36.

Lieutenant Czeremcha then ordered Gawlik to remove his clothes so that the defendants could conduct a strip search prior to admitting him into Administrative Segregation. *Id.* ¶ 37. Gawlik removed his clothes but kept on his rosary and crucifix, which he uses to pray. *Id.* ¶¶ 38-40. Lieutenant Czeremcha ordered Gawlik to remove his rosary and crucifix. *Id.* ¶ 39.  Gawlik refused, explaining to Lieutenant Czeremcha that the rosary and crucifix presented no safety or security issue. *Id.* at ¶ 40. Lieutenant Czeremcha again ordered Gawlik to hand over his rosary and crucifix, this time pulling out a pepper spray can. *Id.* at ¶ 41. Afraid he would be pepper sprayed or beaten if he did not comply with the order, Gawlik removed his crucifix and rosary and handed them to Lieutenant Czeremcha.  *Id.* ¶ 42. Gawlik was then handcuffed again, despite his complaints that his wrist was injured. *Id.* at ¶ 46.

After Gawlik was placed into a cell in Administrative Segregation, Nurse Parker examined him. *Id.* at ¶ 47. Although Gawlik showed her his wrist, which was injured, blue from lack of blood circulation and scratched from the handcuffs, Nurse Parker noted on her examination report that Gawlik had no visible injuries. *Id.* at ¶¶ 47-48; *see also* Pl.'s Ex. C, Doc. No. 1 at 57. After Nurse Parker left, Gawlik informed the officers performing safety checks that he had been injured by Officer Buckland and needed medical treatment for his wrist. *Id.* at ¶ 49. After nearly two hours of ignoring Gawlik's pleas, the officers finally called the medical

4

department to examine Gawlik. *Id.* at ¶ 50. Nurse Parker returned to evaluate Gawlik's injuries and examined his wrists. *Id.* at ¶ 51. After examining him, she filled out a sick call report in which she noted that Gawlik's wrists were discolored, tender and swollen as a result of handcuffs that had been applied too tightly. *Id.* at ¶ 53; *see also* Pl.'s Ex. D, Doc. No. 1 at 59. She prescribed Gawlik Motrin for the pain but refused to take pictures of the injuries. *Id.* at ¶¶ 53-54.

That evening, Gawlik received a disciplinary report charging him with security tampering, a Class A offense, for engaging in the unauthorized or fraudulent use of the mail system. *See* Pl.'s Ex. A, Doc. No 1 at 43. Gawlik pleaded guilty and received sanctions of seven days of punitive segregation, thirty days loss of commissary privileges, thirty days loss of mail privileges, and forfeiture of fifteen days of Risk Reduction Earned Credit. *Id.* at 44.

On March 27, 2018, Gawlik told Captain Watson, the administrator that runs the Administrative Segregation unit, that his wrists had become increasingly swollen overnight and that he needed to see the nurse. *Id.* at ¶¶ 56-57. Captain Watson told him that he had already been seen the previous day and did not need to be examined by the nurse again. *Id.* at ¶ 58. Several hours later, Gawlik asked Captain Watson why his rosary and crucifix had been confiscated and explained that he needed them in order to pray. *Id.* ¶ 59. Captain Watson told Gawlik that he did not care about any religious articles and suggested that Gawlik write to the chaplain. *Id.* ¶ 60. Gawlik's rosary and crucifix were not returned to him during the seven days that he remained in Administrative Segregation. *Id.* at ¶ 61.

On March 28, 2018,[2] Gawlik asked Captain Watson to permit him to go outside for recreation. *Id.* ¶ 63.  Captain Watson told Gawlik that no outdoor recreation was permitted in

---

[2] Gawlik lists the date that he spoke to Captain Watson as June 28, 2018.  *Id.* ¶ 63. Given that Gawlik alleges that he remained in Administrative Segregation for seven days, it appears that he spoke to Captain Watson on March 28,

Administrative Segregation. *Id.* Gawlik was denied access to exercise or outdoor recreation during the seven days that he was held in Administrative Segregation. *Id.* at ¶ 65.

On April 12, 2018, Gawlik submitted an inmate request to Lieutenant Czeremcha alleging that the confiscation of his rosary and crucifix had violated Administrative Directive 6.10. *Id.* ¶¶ 95-96. On April 25, 2018, Lieutenant Czeremcha replied to Gawlik's request, stating that Gawlik's crucifix and rosary were confiscated because they were metal and could pose a threat to safety and security. *Id.* at ¶ 97; *see also* Pl.'s Ex. J, Doc. No. 1 at 77-78. Lieutenant Czeremcha further noted that Gawlik could have requested a review of the confiscation of his religious items when the unit manager and the chaplain toured the unit. *Id.*

On April 26, 2018, Gawlik filed a Level 1 grievance regarding Lieutenant Czeremcha's confiscation of his crucifix and rosary on March 26, 2018.  *Id.* ¶ 66; *see also* Pl.'s Ex. F, Doc. No. 1 at 66-67. On May 7, 2018, Warden Erfe rejected Gawlik's grievance on the basis that it was untimely. *Id.* ¶ 67. On May 8, 2018, Gawlik filed a Level 2 appeal. *Id.*; *see also* Pl.'s Ex. F, Doc. No. 1, at 70-71. On May 31, 2018, District Administrator Quiros upheld the rejection of the Level 1 grievance by Warden Erfe and denied the Level 2 appeal. *Id.* ¶¶ 68-69.

On June 17, 2018, Gawlik sent a letter to Commissioner Semple claiming that on March 26, 2018, Lieutenant Czeremcha had confiscated his crucifix and rosary in violation of Administrative Directives 10.8 and 6.10 and that he needed both items to be able to engage in prayer. *Id.* ¶¶ 70-72, 74-75; *see also* Pl.'s Ex. G, Doc. No. 1, at 71.  On June 25, 2018, Commissioner Semple forwarded Gawlik's letter to Director Williams for a response. *Id.* ¶ 77; *see also* Pl.'s Ex. H, Doc. No. 1, at 74.

On June 29, 2018, Director Williams sent Gawlik a reply to his letter addressed to

Commissioner Semple. *Id.* ¶ 78. In that letter, Director Williams informed Gawlik that the Administrative Directives clearly outline the DOC's need to maintain security, order and safety. *Id.* at ¶ 81. He added that Administrative Directive 10.8 provides that "religious articles that pose a threat to the safety and security of the inmate, staff or other inmates shall either be stored in the inmates property or sent out of the facility." *Id.* at ¶ 87.

On July 7, 2018, Gawlik replied to Director Williams' June 29, 2018 letter. *Id.* ¶¶ 91-92. In his letter, Gawlik indicated that religious articles such as rosaries and crucifixes are permitted in all housing units (including restrictive housing units) and explained that he had been threatened with pepper spray if he refused to hand over his religious items. *Id*. at ¶ 93; *see also* Pl.'s Ex. I, Doc. No. 1, at 76. Director Williams did not reply. *Id.* ¶ 94.

Gawlik next filed a complaint with the Connecticut State Police, alleging that Lieutenant Czeremcha had committed a hate crime by confiscating his rosary and crucifix. *Id.* at ¶ 102. On January 14, 2019, Connecticut State Trooper Mejias visited Gawlik at Cheshire in response to his complaint. *Id.* ¶¶ 103-04.  Gawlik gave a statement to Trooper Mejias detailing the confiscation of his rosary and crucifix on March 26, 2018. *Id.* at ¶ 106. Gawlik also provided Trooper Mejias with a written statement. *Id.* at ¶ 110. Trooper Mejias told Gawlik that his complaint would be reviewed by the Office of the State's Attorney and that Gawlik would be notified with regard to the results of the investigation within several months. *Id.* ¶¶ 112, 114.

On May 15, 2019, Gawlik sent a letter to Major Rosado at the Connecticut State Police Department to request an update on the status of his hate crime complaint. *Id.* ¶¶ 113-15; *see also* Pl.'s Ex. L, Doc. No. 1, at 88. He received no reply. *Id* at ¶ 116. In June 2019, Gawlik filed a civilian complaint with the Internal Affairs Unit of the State Police against State Trooper Mejias

for failing to investigate his hate crime complaint. *Id.* ¶¶ 117, 120; *see also* Pl.'s Ex. M. Doc. No. 1 at 90. On June 25, 2019, a lieutenant from the Connecticut State Police Internal Affairs Division, Lieutenant Ceruti, sent Gawlik a letter regarding the civilian complaint that Gawlik had filed against State Trooper Mejias. *Id.* ¶¶ 121-22. Lieutenant Ceruti informed Gawlik that he had investigated the allegations against Trooper Mejias and had reviewed Trooper Mejias' case report. Pl.'s Ex. N, Doc. No. 1 at 94-95. According to Lieutenant Ceruti, Trooper Mejias' investigation revealed no evidence that a hate crime had been committed against Gawlik. *Id.*

On July 16, 2019, Gawlik sent a reply to Lieutenant Ceruti. *Id.* ¶ 134. In his letter, Gawlik indicated that Trooper Mejias had not been properly trained to investigate bigotry and therefore could not have properly investigated Gawlik's complaint. *Id.; see also* Pl.'s Ex. O, Doc. No. 1 at 97. He additionally requested clarification with respect to whether evidence gathered by Trooper Mejias had ever been forwarded to the office of the State's Attorney. *Id.*

On August 8, 2019, State Police Detective Edmund Vayan met with Gawlik at Cheshire. *Id.* ¶¶ 140-42. Detective Vayan informed Gawlik that the State's Attorney had determined that no hate crime had occurred in connection with the confiscation of Gawlik's religious items at Cheshire in March 2018. *Id.* ¶¶125-26. Gawlik repeatedly asked Detective Vayan for the name of the State's Attorney that had reviewed his complaint and made that determination, but the detective would not provide him with that information. *Id.* at ¶ 128.

After Gawlik returned to his cell, a DOC official delivered a letter sent to him by Lieutenant Ceruti on July 30, 2019. *Id.* ¶¶ 129-30. In that letter, Lieutenant Ceruti explained that because Trooper Mejias had uncovered no evidence of a hate crime during his investigation into Gawlik's complaint, the complaint was not required to be referred to the State's Attorney for

review. *Id.* at ¶ 34; Pl.'s Ex. Q, Doc. No. 1 at 100.

Later that day, Gawlik sent a letter to State Police Detective Vayan requesting an explanation of the conflicting information he had been provided regarding the investigation into his complaint. *Id.* ¶¶ 137-38; *see also* Pl.'s Ex. R Doc. No. 1 at 100. Gawlik asked Detective Vayan to clarify whether the State's Attorney in Danielson had determined that no hate crime had occurred, or whether State Trooper Mejias had instead made that determination. *Id.* ¶ 138; *see also* Pl.'s Ex. R Doc. No. 1 at 102. Gawlik does not appear to have received a reply.

### III.    Discussion

In his complaint, Gawlik brings claims against the defendants under section 1983, generally alleging that the defendants' use of excessive force against him, denial of access to medical care and confiscation of his religious items violated his constitutional rights under the First, Eighth and Fourteenth Amendments. He additionally raises claims under three federal criminal statutes, a claim under RLUIPA, and a claim under section 1985. Finally, Gawlik asks that I exercise supplemental jurisdiction over various state-law claims. Gawlik seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

### 1.    Exhaustion

The Prison Litigation Reform Act of 1995 ("PLRA") requires that, prior to bringing a civil suit challenging prison conditions, a plaintiff must "exhaust such administrative remedies as are available." *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (quoting 42 U.S.C. § 1997e(a)). Because Gawlik is incarcerated in a Connecticut correctional facility, the administrative remedies available to him for resolving administrative or healthcare related issues are provided by the Connecticut Administrative Directives, written guidelines that establish "the parameters of

operation for Connecticut correctional facilities." *Nicholson v. Murphy*, 2003 U.S. Dist. LEXIS 22165, at *18 n.2 (D. Conn. Sept. 19, 2003).

Here, Gawlik submits as an exhibit to his complaint a grievance form filed on April 26, 2018, claiming that the confiscation of his religious articles violated his right to due process. *See* Pl.'s Ex. F, Doc. No. 1 at 67. On May 7, 2021, the grievance was rejected as untimely. *Id.* Gawlik appealed, but the rejection of his grievance was upheld on appeal. *Id.* at 70. At the bottom of the appeal form is a notation indicating that no further review is available; however, because the grievance was untimely filed, the claim is unexhausted.  *Id.* at 70.

With respect to the other claims raised in the complaint, Gawlik merely alleges that he has exhausted his administrative remedies with respect to all defendants but attaches no other grievance forms demonstrating that he has done so. Because it is not clear whether Gawlik was able to timely file his original grievance, whether he exhausted administrative remedies with respect to his other claims or whether an exception to the exhaustion requirement applies, dismissal for failure to exhaust administrative remedies would be premature at this stage of the proceedings. *See, e.g., Ross,* 136 S. Ct. at 1859 (discussing various exceptions to the exhaustion requirement).

### 2.    Claims under Federal Criminal Statutes

Gawlik contends that the defendants' use of excessive force, confiscation of his rosary and crucifix and failure to provide medical treatment for his injuries violated the provisions of 18 U.S.C. §§ 245, 247 and 249. Those statutes, however, are federal criminal statutes that do not provide a private right of action. *See Lopez v. Dir., IRS,* 2017 U.S. Dist. LEXIS 8741, at *16 (D. Conn. Jan. 23, 2017) ("18 U.S.C. § 245 is a federal criminal statute that permits federal

prosecution for interference with a list of federally protected activities and confers neither substantive rights nor a private right of action for damages.") (cleaned up); *Powell Bey v. Jones*, 2019 U.S. Dist. LEXIS 77555, at *4 (E.D.N.Y. May 7, 2019) ("Section 247 does not expressly provide for a private right of action") (collecting cases); *Murat Ates v. United States*, 2020 U.S. Dist. LEXIS 196726, at *10-11 (E.D.N.Y. Oct. 22, 2020) ("Plaintiff asserts claims pursuant to 18 U.S.C. §§ 241, 245, and 249[]. However, these are criminal statutes and do not provide a private right of action.") (collecting cases); *see also Sheehy v. Brown,* 335 F. App'x 102, 104 (2d Cir. 2009) ("To the extent that Appellants assert claims based on the violation of federal criminal statutes, such as 18 U.S.C. §§ 241-242, these claims are not cognizable, as federal criminal statutes do not provide private causes of action."). Accordingly, Gawlik's claims under sections 245, 247 and 249 are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 3.    Section 1983 Claims

Section 1983 provides a private cause of action for violations of federal or constitutional rights committed by officials acting "under the color of state law." 42 U.S.C. § 1983. Where, as here, there is no dispute that the defendants were acting under color of state law, the focus of the inquiry is whether a petitioner has set forth sufficient allegations to demonstrate that he or she was deprived of rights secured by the Constitution or federal law.

#### A.    Eleventh Amendment Immunity

The Eleventh Amendment has been interpreted to bar claims for monetary damages brought against the State, or against a state employee acting in his or her official capacity, unless a State has waived that immunity or Congress has abrogated it. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). In the case at bar, because the Supreme Court has held that section 1983 was

not intended to abrogate sovereign immunity, *see Quern v. Jordan,* 440 U.S. 332 (1979), and because Connecticut has not waived sovereign immunity under section 1983, *see Morneau v. Connecticut*, 150 Conn. App. 237, 251-54 (2014), *cert. denied*, 312 Conn. 926 (2014), Gawlik's claims for monetary damages against officials sued in their official capacities are barred under the Eleventh Amendment.

That bar does not apply, however, when a plaintiff seeks monetary damages from a state official sued in his or her individual capacity—even if the alleged wrongdoing occurred in the course of official duties. *Hafer v. Melo*, 502 U.S. 21, 31 (1991) (state officials are not "absolutely immune from personal liability under § 1983 solely by virtue of the official nature of their acts.") (cleaned up). Gawlik's claims for monetary damages against defendants sued in an individual capacity may therefore proceed consistent with the Eleventh Amendment.

Under the exception to Eleventh Amendment immunity recognized in *Ex Parte Young*, a plaintiff may additionally seek prospective injunctive and declaratory relief against state officials sued in their official capacities. 209 U.S. 123 (1908); *see also In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007). To determine whether the relief sought falls within the bounds of that exception to sovereign immunity, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 638 (2002) (quoting *Idaho v. Coeur d' Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)); *see also Green v. Mansour,* 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young*…to claims for retrospective relief") (cleaned up).

Here, Gawlik seeks a declaration that the defendants violated various federal statutes by

confiscating his religious items and using excessive force against him. Because Gawlik's requests for declaratory relief are addressed to past violations of federal law, those requests are dismissed as barred under the Eleventh Amendment. *See* 28 U.S.C. § 1915A(b)(1).  I will consider Gawlik's requests for injunctive relief below.

        B.        Eighth Amendment Claims

        i.        Deliberate Indifference to Medical Needs

Gawlik alleges that Nurse Parker was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when she failed to take note of the injuries to his wrists caused by the tight handcuffs and failed to provide any treatment for those injuries. He additionally appears to contend that Captain Watson violated the Eighth Amendment by failing to ensure that Gawlik received medical care during the seven days he was held in Administrative Segregation.

The Eighth Amendment's ban on cruel and unusual punishment has been interpreted to prohibit deliberate indifference to an incarcerated individual's serious medical needs by medical providers and prison officials. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"). To state an Eighth Amendment claim premised on the denial of adequate medical treatment, a plaintiff must allege both (1) the existence of a "sufficiently serious" medical need and; (2) that in delaying or denying care for that need, a charged official acted with deliberate indifference. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

Factors relevant to the determination of whether a particular medical need is sufficiently serious include whether "a reasonable doctor or patient would find [it] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (cleaned up). A medical condition that is not initially serious may meet the standard where, left untreated, the condition could "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting *Chance*, 143 F.3d at 702).

Determining whether an official behaved with deliberate indifference, or "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," is a somewhat murkier inquiry. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference lies somewhere on the spectrum between simple negligence and intent to harm; it is "equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280; *see also id.* at 839-40. In order to demonstrate that a charged official acted with deliberate indifference, a plaintiff must allege that the official "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm [would] result." *Salahuddin,* 467 F.3d at 280. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. Nevertheless, knowledge of the risk of harm "may be proven 'from the very fact that the risk was obvious.'" *Spavone v. N.Y. State Dep't of Corr. Servs*., 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Farmer*, 511 U.S. at 842).

Here, Gawlik alleges that he was handcuffed so tightly that both of his wrists became

14

bruised and swollen and the skin on his wrists was rubbed away. Even assuming that those injuries were sufficiently serious to implicate the Eighth Amendment, however, Gawlik alleges only that Nurse Parker failed to note or treat those injuries during his initial examination. After being informed that he was in pain, however, she prescribed Motrin to treat the swelling and pain. Those allegations demonstrate—at most—that Nurse Parker was negligent in failing to note or treat Gawlik's symptoms during her initial evaluation. Further, with respect to Captain Watson, Gawlik alleges only that he was denied medical care for two hours on the first day of his confinement in Administrative Segregation and that Captain Watson refused to call the nurse again the following day despite Gawlik's claim that the swelling had increased. He does not indicate, however, that his condition worsened or even failed to improve on the regimen of Motrin prescribed by Nurse Parker or that Captain Watson was aware of ongoing issues with his wrists and failed to ensure that Gawlik received treatment during the time Gawlik was held in Administrative Segregation. Gawlik has therefore failed to adequately allege that either Nurse Parker or Captain Watson behaved with deliberate indifference to his serious medical needs. Accordingly, the Eighth Amendment claims raised against Nurse Parker and Captain Watson are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

  ii.  Conditions of Confinement

  Gawlik alleges that on the second day of his confinement in Administrative Segregation, he asked Captain Watson for permission to exercise outdoors so that he could get fresh air. Captain Watson refused his request and informed him that inmates in Administrative Segregation were not permitted outdoor recreation. Gawlik contends that the refusal to allow him outdoor recreation or fresh air during the seven days he spent in Administrative Segregation violated the

Eighth Amendment.

The Eighth Amendment does not mandate comfortable prisons, but it also does not permit incarcerated individuals to be subjected to conditions that result in the "wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions are objectively serious enough to implicate the Eighth Amendment where, alone or in combination, they produce "deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). There is no bright-line rule or "static test to determine whether a deprivation is sufficiently serious" to implicate the Eighth Amendment; rather, "the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012). The length of time an inmate is subjected to a particular condition additionally "cannot be ignored in deciding whether the confinement meets constitutional standards." *Rhodes*, 452 U.S. at 373.

Even allegations of inhumane conditions of confinement, however, will not give rise to a cognizable claim under the Eighth Amendment unless a plaintiff demonstrates that a particular defendant-official was aware of the condition (or conditions) and, despite that knowledge, failed to take corrective action. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. At the pleading stage, however, "a plaintiff need only allege...that a defendant had knowledge of the risks faced by the plaintiff; such knowledge may be alleged generally." *Bell v. Luna*, 856 F. Supp. 2d 388, 399 (D. Conn.

16

2012).

Gawlik cites to only one condition—lack of access to fresh air and exercise—in support of his claim. Although it is well-settled that the Eighth Amendment mandates that incarcerated individuals be afforded some opportunity to exercise, *see Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir. 1985), courts in this Circuit have routinely held that relatively brief deprivations of the opportunity to exercise do not rise to the level of an Eighth Amendment violation. *See Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) (holding that keeping plaintiff on full restraint status without outdoor recreation for 22 days does not state an Eighth Amendment claim); *Torrez v. Semple*, 2018 U.S. Dist. LEXIS 84404, at *16 (D. Conn. May 21, 2018) (concluding that inmate's allegation that prison officials denied him "recreation for a period of only ten days" failed to "state a plausible Eighth Amendment claim") (collecting cases); *Riddick v. Arnone*, 2012 U.S. Dist. LEXIS 94718 at *15 (D. Conn. July 9, 2012) (concluding that denial of exercise for 10 days is *de minimis* and does not rise to the level of an Eighth Amendment violation).

Here, Gawlik alleges that he was deprived of a meaningful opportunity to exercise for a period of seven days. Although I am in agreement with Gawlik that such a deprivation is both inhumane and without justification, courts in this Circuit have routinely rejected Eighth Amendment claims premised on the denial of exercise for similarly short periods of time. Accordingly, the conditions of confinement claim raised against Captain Watson and the requests for injunctive relief are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### iii.    Excessive Force

Gawlik additionally alleges that Officer Buckland and Officer Brown used excessive force in violation of the Eighth Amendment when they applied his handcuffs too tightly and used

a wrist-lock technique that caused him substantial pain. In particular, Gawlik alleges that the very tight cuffs led him to suffer pain, swelling and bruising in both wrists and scraped a layer of skin off his left wrist. He additionally alleges that Lieutenant Czeremcha, Captain Watson and Officers Smith, Parker and Cunningham violated the Eighth Amendment by failing to intervene to prevent the use of excessive force.

To state an Eighth Amendment claim premised on the use of excessive force, an incarcerated individual must allege both (1) that prison officials subjected him or her to "sufficiently serious" harmful conduct; and (2) that the officials did so with a culpable state of mind. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). Both inquiries are fact-dependent; the Supreme Court has provided guidance, but not bright-line rules, for determining whether the conduct of prison officials implicates the Eighth Amendment. *See, e.g., Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ("the Eighth Amendment's prohibition of cruel and unusual punishments draws its meaning from the evolving standards of decency that mark the progress of a maturing society, and so admits of few absolute limitations.") (cleaned up).

The use of force by prison officials is "objectively harmful enough… to reach constitutional dimensions" where it is "incompatible with evolving standards of decency" or involves "the unnecessary and wanton infliction of pain." *Crawford*, 796 F.3d at 256 (quoting *Hudson,* 503 U.S. at 10). Not "every malevolent touch by a prison guard gives rise to a federal cause of action" and the "*de minimus* use[] of physical force" does not implicate the Eighth Amendment "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citation omitted). Although injury (or lack thereof) may be relevant to the inquiry of whether excessive force was used, "[i]njury and force. . . are only

imperfectly correlated, and it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). Accordingly, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* Rather, the "malicious[] and sadistic[]" use of force violates "contemporary standards of decency" whether or not serious injury results. *Hudson*, 503 U.S. at 9.

In determining whether officials acted with a sufficiently culpable state of mind, the "core judicial inquiry is…whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7. If "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may. . . be sufficient evidence of a culpable state of mind." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). "[T]he need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response" may be indicative of whether the use of force was indeed driven by legitimate purpose or instead wanton or unnecessary. *Hudson*, 503 U.S. at 7 (cleaned up).

Under some circumstances, even officials who do not directly participate in the use of physical force may be held liable for failing to intervene to protect an incarcerated individual or detainee. "Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994) ("[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where

19

that officer observes or has reason to know…that excessive force is being used.").

The Second Circuit has recognized that the application of excessively tight handcuffs or restraints "in excess of what was necessary under the circumstances" may rise to the level of an Eighth Amendment violation. *See Davidson v. Flynn*, 32 F.3d 27, 30 (2d Cir. 1994); *see also Boyd v. Doe*, 2019 U.S. Dist. LEXIS 68214, at *19 (N.D.N.Y. Apr. 23, 2019) ("courts have held that tight handcuffing gives rise to an Eighth Amendment claim when [1] the handcuffs were unreasonably tight; [2] the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and [3] there is a degree of injury to the wrists") (cleaned up). The key inquiry is not the extent of the injuries sustained as a result of the tight cuffs, but instead "whether the alleged conduct involved unnecessary and wanton infliction of pain." *Davidson*, 32 F.3d at 30 (cleaned up).

Here, although Gawlik alleges that he suffered relatively minor injuries from the application of the handcuffs—injuries that were managed by Motrin prescribed for a period of three days—the crux of his claim is that the defendants applied the handcuffs too tightly and bent back his wrists for the very purpose of causing him pain. Indeed, Gawlik alleges that he was compliant with all of the officers' instructions; despite his lack of resistance, the officers tightened the cuffs and twisted his wrist into an extremely painful position that left him afraid his wrists would break. Accordingly, Gawlik has set forth sufficient allegations to state a cognizable Eighth Amendment claim for excessive use of force against Officers Buckland and Brown.

Gawlik additionally alleges that Lieutenant Czeremcha and Officers Smith, Parker and Cunningham were aware that the cuffs were applied too tightly, and that the wrist-lock technique was causing him severe pain. In particular, Gawlik states that he repeatedly—and on camera—

20

asked Lieutenant Czeremcha to direct the officers to stop twisting his wrists because of the extreme pain he was experiencing. Lieutenant Czeremcha, however, ignored those pleas, as did the other officers. Because those allegations are sufficient at this stage of the pleadings to evince awareness that excessive force was being used, Gawlik's Eighth Amendment excessive force claim will proceed against Lieutenant Czeremcha and Officers Smith, Parker, and Cunningham in their individual capacities for further development of the record.

Although Gawlik additionally brings a claim for excessive force against Captain Watson, it does not appear from the allegations in the complaint that Captain Watson was present when the cuffs were applied or during Gawlik's escort to the Administrative Segregation unit. Accordingly, the excessive force claim against Captain Watson is dismissed. To the extent that Gawlik possesses additional facts with respect to Captain Watson's involvement with the tight handcuffs or use of the wrist-lock position, he may amend the complaint to include those facts.

### C.    Fourteenth Amendment Claims

Gawlik contends that Lieutenant Czeremcha and Officers, Smith, Buckland, Brown, Parker, and Cunningham violated his right to due process under the Fourteenth Amendment when they confiscated his crucifix and rosary prior to his placement in Administrative Segregation. He further contends that under Administrative Directive 6.10, Captain Watson, as the unit manager of the Administrative Segregation unit, was responsible for conducting a review regarding Gawlik's continued possession of those religious articles. When Gawlik complained to Captain Watson, however, Captain Watson merely told Gawlik to write the Chaplain. Finally, although Gawlik informed District Administrator Quiros, Warden Erfe, Director Williams and Commissioner Semple about the confiscation of his religious items, those defendants failed to

take corrective action to remedy the constitutional violation. [3]

The due process clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Due process "is a flexible concept that varies with the particular situation"; the fundamental requirement, however, is the opportunity to be heard at a meaningful time and in a meaningful manner. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). To state a cognizable due process claim, a plaintiff must allege that (1) he or she has been deprived of a protected property interest and (2) that the procedures followed by the state in conjunction with that deprivation were constitutionally inadequate. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

Here, Gawlik alleges that he has a protected property interest in his crucifix and rosary, and that the defendants confiscated those items from him and refused to return them during the period he remained in Administrative Segregation. He further alleges that Administrative Directive 10.8 authorizes confiscation of religious property without due process and is therefore facially unconstitutional. That directive, however, provides that any confiscation of property must occur "in accordance with Administrative Directive 6.10, Inmate Property." Conn. Ad. Dir. 10.8. Administrative Directive 6.10 (16) provides that a restrictive housing unit manager must conduct a review of the continued possession of religious items by an inmate placed in restrictive housing, and that "[a]n inmate may grieve the decision [to remove religious property] in accordance with Administrative Directive 9.6, Inmate Administrative Remedies." *Id.* at 6.10. Finally, to the extent that Gawlik claims that his property has been damaged or not returned,

---

[3] To the extent that Gawlik intends to raise a Fourteenth Amendment claim premised on violations of the Administrative Directives, that claim is dismissed—the failure to comply with an administrative directive does not give rise to a claim under section 1983. *See Harris v. Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011); *Osuch v. St. John*, 2018 U.S. Dist. LEXIS 187652 (D. Conn. Nov. 2, 2018) ("a failure to follow a Department of Correction

under Administrative Directive 9.6 (9), an individual whose property has been lost or damaged

by the Department of Correction ("DOC") may file a claim with the Lost Property Board, which

"shall hear and determine any claim by an inmate in a correctional facility who seeks

compensation not exceeding . . . ($3,500.00) for lost or damaged personal property". Conn.

Admin. Dir. 9.6. If the Board denies the claim in whole or in part, a plaintiff may then pursue

his property claim with the Connecticut Claims Commissioner. *Id.*

In his complaint, Gawlik alleges only that although he filed a grievance with regard to his

lost property within thirty days after being released from Administrative Segregation, his

grievance was improperly rejected as untimely. Because Gawlik has alleged only that his

grievance was wrongfully rejected and has set forth no facts to demonstrate that the remedies

available to him were constitutionally inadequate in light of the significance of the property

interest at stake, he has failed to state a cognizable due process claim. *See, e.g., Riddick v.*

*Semple,* 731 F. App'x 11, 13 (2d Cir. 2018) (affirming dismissal of due process claim where

complaint did not allege that post-deprivation remedies provided by state statutes and

Administrative Directives were inadequate). To the extent that Gawlik possesses additional facts

to suggest that the grievance procedures do not afford a constitutionally adequate or timely

remedy for the confiscation of religious items, he may amend the complaint to include those

facts.

Further, with respect to Director Quiros, Warden Erfe, Commissioner Semple and

Director Williams, Gawlik contends only those defendants failed to address his complaints about

the confiscation of his property. Specifically, Gawlik alleges that on April 26, 2018, he filed a

Level 1 grievance regarding the confiscation of his religious items prior to and during his

---

directive does not give rise to a section 1983 claim").   23

placement in Administrative Segregation and that Warden Erfe rejected the grievance as

untimely on May 7, 2018. He appealed the rejection on May 8, 2018; Director Quiros rejected

the appeal on May 31, 2018. He subsequently sent a letter to Commissioner Semple on June 17,

2018, but instead of responding to Gawlik directly, Commissioner Semple forwarded the letter to

Director Williams for a response. On June 29, 2018, Director Williams sent Gawlik a letter

explaining that Gawlik could have filed a grievance regarding the decision to remove religious

articles under Administrative Directive 6.10(16). Nowhere does Gawlik allege that any of those

defendants were present during or otherwise involved in the confiscation of his rosary and

crucifix.

In *Tangreti v. Bachmann*, reviewing an Eighth Amendment claim for money damages

raised against various DOC officials, the Second Circuit reexamined the requirements for

holding a supervisory official liable under section 1983. 983 F.3d 609 (2020). Considering the

impact of the watershed opinion in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the *Tangreti* Court

concluded that "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff

must plead and prove that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676).

Here, Gawlik alleges only that Director Quiros, Warden Erfe, Commissioner Semple and

Director Williams were made aware of the wrongful confiscation of property and failed to

remedy the constitutional violation. Those allegations are insufficient, under *Tangreti*, to impose

liability against the defendants. To the extent that Gawlik seeks to reassert due process claims

against Director Quiros, Warden Erfe, Commissioner Semple and Director Williams in any

amended complaint, he must include additional facts demonstrating personal involvement in the

alleged constitutional violation.

      C.    <u>First Amendment Claim</u>

Gawlik additionally alleges that the confiscation of his crucifix and rosary violated his First Amendment right to practice his religion. He brings claims against Lieutenant Czeremcha and Officers Smith, Buckland, Brown, Parker, and Cunningham, who he alleges personally confiscated those items, and Captain Watson, who he alleges refused to ensure those items were returned to him to him during the time he was held in Administrative Segregation. He additionally brings claims against Director Williams, Commissioner Semple, Warden Erfe and Director Quiros, who he informed about the confiscation of his items after he was released from Administrative Segregation.

The First Amendment Free Exercise Clause requires that government officials respect, and avoid interference with, the religious beliefs and practices of the people. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). It is well-settled law that the right to free exercise of religion is not forfeited simply by virtue of incarceration. "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (cleaned up); *see also Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."). The right to exercise religion within prison walls, however, is not absolute and must instead be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Accordingly, a free exercise claim raised by an

incarcerated individual must be judged "under a reasonableness test less restrictive than that ordinarily applied: a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin*, 467 F.3d at 274 (cleaned up); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987) ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests").

To state a cognizable free exercise claim, a plaintiff "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* at 274-75. Specifically, a plaintiff must set forth facts to demonstrate that he or she sincerely holds a particular belief, that the belief is religious in nature, and that the challenged action substantially interfered with the exercise of that belief. *See Ford*, 352 F.3d at 588-91.[4] "A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (cleaned up). The focus of the inquiry is not "the objective reasonableness" of a particular belief, but instead whether a plaintiff "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590.

Here, Gawlik alleges that he is a devout Catholic who prays every hour using his crucifix and rosary and that without the rosary and crucifix, he is unable to pray. At this stage of the proceedings, those allegations are sufficient to demonstrate that confiscation of the crucifix and rosary and refusal to return those items interfered with sincerely held religious beliefs. *See, e.g.,*

---

[4] In *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014), the Second Circuit suggested without deciding that the "substantial burden test" may no longer be viable in light of the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). The issue is irrelevant here, however, because even assuming that Gawlik must demonstrate that the defendants' actions substantially burdened his exercise of religion, he has set forth

*Cutter*, 544 U.S. at 720 ("The exercise of religion often involves not only belief and profession but the performance of physical acts such as assembling with others for a worship service or participating in sacramental use of bread and wine.") (quoting *Employmentt Division, Department of Human Resources. v. Smith*, 494 U.S. 872, 877 (1990)). Accordingly, Gawlik's free exercise claim will proceed against Lieutenant Czeremcha, Captain Watson and Officers Smith, Buckland, Brown, Parker and Cunningham in their individual capacities and in their official capacities to the extent that Gawlik seeks injunctive relief.

With respect to Commissioner Semple, Warden Erfe, Director Williams and District Administrator Quiros, however, Gawlik alleges only that those defendants were made aware of the confiscation of his religious items after the fact and failed to take action. As discussed above, those allegations are insufficient—in the aftermath of *Tangreti*—to support a claim for money damages against supervisory officials. To the extent that Gawlik possesses additional facts to demonstrate the personal involvement of any of those defendants in the confiscation of his religious items, he may amend the complaint to include those facts. Because personal involvement is not required in order to seek injunctive relief, however, claims for injunctive relief premised on the First Amendment violation will proceed against Commissioner Semple, Warden Erfe, Director Williams and District Administrator Quiros. *See, e.g., Barnes v. Annucci*, 2021 U.S. Dist. LEXIS 105632, at *12 n. 6 (N.D.N.Y. June 3, 2021) (report and recommendation) ("Personal involvement is required for the assessment of damages under section 1983, not for injunctive relief."); *Peoples v. Leon*, 2021 U.S. Dist. LEXIS 48572, at *15 (N.D.N.Y. Mar. 16, 2021) (same).

**4**.    **Claims under RLUIPA**

---

sufficient allegations to meet that standard.                    27

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution…unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Under RLUIPA, a plaintiff must first demonstrate that a particular government practice substantially burdens the exercise of his or her religion. If that threshold is met, "the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009).

Here, Gawlik alleges that the confiscation of his rosary and crucifix during his placement in Administrative Segregation interfered with his ability to pray, and therefore interfered with his ability to practice his Catholic faith. Those allegations are sufficient to state a *prima facie* claim under RLUIPA. *See, e.g., Braun v. Sterno*, 2018 U.S. Dist. LEXIS 187654, at *14 (D. Conn. Oct. 31, 2018) (permitting RLUIPA claim to proceed on same set of facts as First Amendment claim). The Second Circuit has held, however, that RLUIPA "does not authorize monetary damages against state officers in either their official or individual capacities." *Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (cleaned up). A plaintiff may instead obtain only injunctive or declaratory relief as a remedy for a RLUIPA violation. *See, e.g., Booker v. Graham*, 974 F.3d 101, 107–08 (2d Cir. 2020) ("RLUIPA provides only for injunctive and declaratory relief when a prison violates an inmate's religious rights.") (cleaned up). Accordingly, to the extent that Gawlik seeks money damages against the defendants in their individual or official capacities for

violations of RLUIPA, those claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1). Because

Gawlik seeks injunctive relief related to the confiscation of religious articles, I will permit the

RLUIPA claim to proceed against Lieutenant Czeremcha, Captain Watson, Officers, Smith,

Buckland, Brown, Parker, and Cunningham, Commissioner Semple, Warden Erfe, District

Administrator Quiros, and Director Williams in their official capacities.

### 5.   Section 1985 Claims

Gawlik alleges that Commissioner Semple, Warden Erfe, District Administrator Quiros,

Director Williams, Lieutenant Czeremcha, Captain Watson, Officers Smith, Buckland, Brown,

Parker, and Cunningham conspired to violate his constitutional rights by confiscating his rosary

and crucifix, failing to intervene prevent the use of excessive force and failing to treat his

subsequent injuries from the use of excessive force in violation of 42 U.S.C. § 1985. Although

Gawlik does not specify, I assume that he intends to raise claims under subsection (3) of section

1985, as the other subsections are not relevant to this action.  Subsection 3 provides, in relevant

part:

> If two or more persons in any State or Territory conspire…for the purpose of depriving,
> either directly or indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws, or for the purpose of
> preventing or hindering the constituted authorities of any State or Territory from giving
> or securing to all persons within such State or Territory the equal protection of the laws…
> if one or more persons engaged therein do, or cause to be done, any act in furtherance of
> the object of such conspiracy, whereby another is injured in his person or property, or
> deprived of having and exercising any right or privilege of a citizen of the United States,
> the party so injured or deprived may have an action for the recovery of damages,
> occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

Although section 1985 protects a broad swathe of individual civil rights, a fundamental

requirement of a cognizable claim under the statute is the existence of a conspiracy. "In order to

maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (cleaned up). Here, although Gawlik has alleged that the defendants violated a number of his federally protected civil and constitutional rights, he sets forth no allegations to support the claim that the defendants engaged in a *conspiracy* to violate those rights. Accordingly, to the extent that Gawlik intends to bring claims under section 1985, those claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 6.    Claims Against Connecticut State Troopers and Commissioner Rovella

Gawlik additionally brings claims against State Trooper Mejias, Lieutenant Ceruti and Detective Vayan for their failure to adequately investigate his claims that the defendants violated Connecticut General Statutes § 53a-181k when they confiscated his rosary and crucifix. He further alleges that Commissioner Rovella failed to properly train Trooper Mejias to investigate crimes involving religious bigotry and bias. In support of those claims, Gawlik alleges that although he filed a report with Trooper Mejias detailing the confiscation of his crucifix and rosary by officials at Cheshire, his complaint was not properly investigated, nor was it referred to the State's Attorney for review.

It is well-settled that "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Lis v. Leahy,* 1991 U.S. Dist. LEXIS 21749, at *2 (W.D.N.Y. June 3, 1991) ("[a] private citizen does not have a constitutional right to initiate or to compel the initiation of criminal proceedings"); *Trapani v. Dagostino*, 2019 U.S. Dist. LEXIS 181925, at *37 (N.D.N.Y. June 10, 2019) ("[P]laintiff had no constitutionally protected right

to file a criminal complaint") (cleaned up); *Osuch v. Gregory*, 303 F. Supp. 2d 189, 194 (D. Conn. 2004) ("An alleged victim of a crime does not have a right to have the alleged perpetrator investigated or criminally prosecuted."). Nor does Gawlik have a right to have the defendants investigated by the state police or the Department of Emergency Services and Public Protection. *See, e.g.*, *Hayes v. Cty. of Sullivan*, 853 F. Supp. 2d 400, 433 (S.D.N.Y. 2012) ("[C]ourts in the Second Circuit have long held that an individual has no constitutionally protected right to an investigation by government officials of alleged wrongdoing by other government officials.") (collecting cases); *Rzayeva v. United States*, 492 F. Supp. 2d 60, 73 (D. Conn. 2007) ("this Court lacks jurisdiction to order federal agents to initiate a prosecution").

Because there is no cognizable constitutional right to have the defendants criminally investigated or prosecuted in state court, allegations that Trooper Mejias failed to refer Gawlik's complaint to the State's Attorney or that the State's Attorney failed to pursue that complaint do not plausibly allege a violation of constitutional or federally protected rights. Further, the purportedly inadequate investigation of the hate crime complaint does not, without more, evince deliberate indifference to a serious risk of harm to Gawlik's health or safety in violation of the Eighth Amendment. Accordingly, the federal claims raised against defendants Mejias, Ceruti, Vayan, and Rovella are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 7.   <u>State Law Claims</u>[5]

Gawlik additionally requests that I exercise supplemental jurisdiction over various state-law claims, including both statutory and common law claims. I address those claims in turn.

i.   Negligence

---

[5] Because Gawlik's requests for injunctive relief appear to relate to his federal claims, I do not address claims for injunctive relief premised on violations of state law.

Gawlik generally alleges that the conduct of Director Williams, Lieutenant Czeremcha, Captain Watson, Officers Smith, Buckland, Brown, Parker, Cunningham, Trooper Mejias, Lieutenant Ceruti, Detective Vayan, Commissioner Rovella, and Nurse Parker constituted common-law negligence. Under Connecticut law, claims seeking damages against state employees in their individual capacities are barred under Connecticut General Statutes section 4-165(a), which provides: "[n]o state officer or employee shall be personally liable for damages or injury, not wanton or reckless or malicious, caused in the discharge of his duties or within the scope of his employment." Conn. Gen. Stat. § 4-165(a). State employees therefore cannot be held personally liable for negligent actions so long as those actions are performed within the scope of employment. *Miller v. Egan,* 265 Conn. 301, 319 (2003). In order to overcome that statutory bar, a plaintiff must allege that the charged official's conduct was "wanton, reckless or malicious", a standard defined by Connecticut courts as "more than negligence, more than gross negligence." *Martin v. Brady*, 261 Conn. 372, 379 (2002) (cleaned up).

Here, Gawlik raises only claims of simple negligence against the defendants and does not allege that any of those defendants acted outside the scope of employment during the alleged deprivations of medical care, excessive use of force, confiscation of religious items and the inadequate investigations of his hate-crime complaint. Accordingly, the negligence claims are dismissed as barred by statutory immunity under section 4-165. *See* 28 U.S.C. § 1915A(b)(2).

To the extent Gawlik seeks instead to bring a claim for negligence against those defendants in their official capacities, "[i]t is settled law in Connecticut that the state is immune from suit unless, by appropriate legislation, it authorizes or consents to suit." *First Union Nat'l Bank v. Hi Ho Mall Shopping Ventures, Inc.*, 273 Conn. 287, 293 (2005) (cleaned up). The

32

principle of sovereign immunity applies to lawsuits against a state as well as to lawsuits against a state official in his or her official capacity. "[B]ecause the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state." *Miller*, 265 Conn. at 313 (cleaned up). The Connecticut Supreme Court, however, has recognized three exceptions to that general bar on suits against the state:

> (1) when the legislature, either expressly or by force of a necessary implication, statutorily waives the state's sovereign immunity; (2) when an action seeks declaratory or injunctive relief on the basis of a substantial claim that the state or one of its officers has violated the plaintiff's constitutional rights; and (3) when an action seeks declaratory or injunctive relief on the basis of a substantial allegation of wrongful conduct to promote an illegal purpose in excess of the officer's statutory authority.

*Columbia Air Services v. DOT*, 293 Conn. 342, 349 (2009) (cleaned up). In the absence of statutory waiver, a "plaintiff may not bring an action against the state for monetary damages without authorization from the claims commissioner to do so." *Id.* at 351.

Here, Gawlik alleges no facts to suggest that statutory immunity has been waived, nor does he allege that he sought or received authorization from the Claims Commissioner to file a claim against any of the named defendants. Accordingly, to the extent that Gawlik seeks money damages from defendants sued in their official capacities, that request is barred by sovereign immunity and the claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1)-(2).

ii.     Assault and Battery

Gawlik contends that the application of excessively tight handcuffs and use of the wrist-lock technique by Lieutenant Czeremcha and Officers Smith, Buckland, Brown, Parker, and Cunningham constituted assault and battery. Under Connecticut law, "liability for battery arises

if (a) a person acts intending to cause a harmful or offensive contact with the person of the other or a third person ... and (b) a harmful contact with the person of the other directly or indirectly results." *Simms v. Chaisson*, 277 Conn. 319, 331 (2006) (quoting Restatement (Second), Torts § 13 (1965)). "Liability for assault arises if (a) a person acts intending to cause a harmful or offensive contact with the person of the other ... and (b) the other is thereby put in such imminent apprehension." *Id.*  To "constitute an actionable assault and battery there must have been an unlawful force applied to one person by another." *Moriarty v. Lippe*, 162 Conn. 371, 389 (1972).

Here, the same allegations that Gawlik relies upon to plead a claim for excessive force give rise to cognizable claims for assault and battery against Officers Buckland and Brown. Further, although Gawlik does not allege that the defendants were acting outside the scope of employment, state officials do not have "statutory immunity for wanton, reckless or malicious actions" and therefore the assault and battery claims raised against the defendants in their individual capacities are not barred by statutory immunity.[6] *Miller*, 265 Conn. at 319. Because those claims additionally arise out of the same set of facts as Gawlik's Eighth Amendment use of force claim, I will exercise supplemental jurisdiction over the assault and battery claims raised against Officers Buckland and Brown in their individual capacities. 28 U.S.C. § 1367.

iii.   Statutory Claims

Finally, Gawlik contends that the confiscation of his rosary and crucifix and use of excessive force violated numerous state statutes, including Connecticut General Statutes §§ 52-571(a)-(c), 53-37b and 46a-71. I will address those claims in turn.

---

[6] Again, because Gawlik has included no facts to suggest that sovereign immunity has been waived or that he has received authorization from the claims commissioner to file suit, any claims for money damages raised against the defendants in their official capacities are dismissed.

Connecticut General Statutes Section 52–571a provides in relevant part: "[a]ny person aggrieved by a violation of section 53-37b may apply to the Superior Court for injunctive relief, recovery of damages and such other relief as the court deems just and equitable." Conn. Gen. Stat. § 52-571a. Section 53-37b in turn provides: "[a]ny person who, acting alone or in conspiracy with another, for the purpose of depriving any person or class of persons of the equal protection of the laws of this state or the United States, or of equal privileges and immunities under the laws of this state or the United States, engages in the use of force or threat, as provided in [Connecticut General Statutes] § 53a-62, shall be guilty of a class A misdemeanor or a class C felony." Conn. Gen. Stat. § 53-37b. Although Gawlik alleges that the defendants violated a number of his constitutional rights, he does not include facts to suggest that he was denied equal protection under the law "compared with others similarly situated" or otherwise discriminated against. *Crosdale v. Town of Greenwich,* 2011 Conn. Super. LEXIS 1375, at *12 (Super. Ct. May 31, 2011); *see also Doe v. Town of W. Hartford,* 2018 Conn. Super. LEXIS 1670, at *8 (Super. Ct. July 27, 2018) (dismissing claim raised under section 52-571a where plaintiff had not set forth any allegations to demonstrate that defendants acted with discriminatory animus). Accordingly, he has failed to state a cognizable claim under section 52-571a.

Gawlik additionally brings claims under Section 46a-71, which prohibits discriminatory conduct by state agencies on the basis of "race, color, religious creed, sex, gender identity or expression, marital status, age, national origin, ancestry, intellectual disability, mental disability, learning disability, physical disability, including, but not limited to, blindness, or status as a veteran." Conn. Gen. Stat. § 46a-71(a). Although the statute itself does not provide a private right of action, section 46a-99 provides that "[a]ny person claiming to be aggrieved by a

35

violation of any provision of sections 46a-70 to 46a-78, inclusive…may petition the Superior Court for appropriate relief and said court shall have the power to grant such relief, by injunction or otherwise, as it deems just and suitable." Conn. Gen. Stat. § 46a-99.

Here, even assuming that Gawlik's claims under section 46a-99 are not barred by sovereign or statutory immunity, he has set forth no facts to suggest that the confiscation of his religious items occurred as a result of "discrimination based upon…religious creed" other than to allege that Director Williams is a Protestant minister and therefore does not understand Catholicism. Conn. Gen. Stat. § 46a-71(a). Accordingly, Gawlik has not alleged sufficient facts to state a cognizable claim section 46a-71, and those claims are dismissed. *See, e.g., Torrey Terrial Townsend v. Molina,* 2020 Conn. Super. LEXIS 621, at *10 (Super. Ct. June 5, 2020) (granting summary judgment where plaintiff failed to "present any evidence of disparate treatment on the defendant's behalf.").

Gawlik additionally raises claims under section 52-571c, which provides a private right of action for damages for violations of sections §§ 53a–181j, 53a–181k or 53a–181l, criminal statutes that prohibit intimidation on the basis of bigotry or bias. Conn. Gen. Stat. 52-571c. As discussed with respect to his claim under section 46a-71 and 52-571c, however, Gawlik alleges no facts to support his claim that the defendants' conduct occurred as the result of religion-based animus. Without more, Gawlik has failed to plausibly state a claim under section 52-571c, and those claims are dismissed. *Cf. Umeugo v. Czajkowski,* 1999 Conn. Super. LEXIS 1171, at *4 (Super. Ct. May 7, 1999) (denying summary judgment on claim raised under section 52-571c where plaintiff set forth evidence that defendant used racial slurs).

36

Finally, Gawlik brings claims under the Connecticut Act Concerning Religious Freedom, which provides that "[t]he state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 article first of the Constitution of the state even if the burden results from a rule of general applicability" except where application of such a burden "is in furtherance of a compelling governmental interest, and [ ] is the least restrictive means of furthering that compelling governmental interest." Conn. Gen. Stat. § 52-571b. Described by Connecticut courts as analogous to the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, the statute is principally designed to provide greater protection to the practice of religion through "rituals, rites and practices." *Gawlik v. Semple*, 2018 Conn. Super. LEXIS 2305, at \*50 (Super. Ct. Aug. 31, 2018).

Connecticut courts have held that although that statute authorizes suit against the state, "it does not authorize an award of money damages against the state." *Francis v. Conn. Dep't of Corr.*, 2014 Conn. Super. LEXIS 1703, at \*4 (Super. Ct. July 17, 2014); *see also Gawlik v. Malloy*, 2019 Conn. Super. LEXIS 1626, at \*37 (Super. Ct. May 31, 2019). Because Gawlik does not allege that he has received authorization to sue, any claims for money damages raised against the defendants in their official capacities are dismissed. To the extent that Gawlik brings claims under that section against the defendants in their individual capacities, it is not clear that the statute authorizes such an action. *See* Conn. Gen. Stat. 52-571b ("A person whose exercise of religion has been burdened in violation of the provisions of this section may assert that violation as a claim…and obtain appropriate relief *against the state or any political subdivision of the state*.") (emphasis added). Because Connecticut courts do not appear to have clearly addressed that issue, I decline to exercise supplemental jurisdiction over the claim. *See, e.g., Lopez v.*

*Smiley*, 375 F. Supp. 2d 19, 25 (D. Conn. 2005) ("When faced with state law claims that raise

novel and complex issues of state law, a district court, in its discretion, may decline to exercise

supplemental jurisdiction over such claims.") (cleaned up).

     iv.    State Constitutional Claims

Gawlik additionally appears to contend that the defendants' conduct violated provisions

of the Connecticut constitution. However, he does not specificy which sections of the

Constitution were purportedly violated. To the extent that Gawlik seeks to raise claims against

the defendants premised on violations of the Connecticut Constitution, he may do so in an

amended complaint.

**IV.**    **Conclusion**

**(1)**    The following claims are **DISMISSED** with prejudice pursuant to 28 U.S.C. §

1915A(b)(1)-(2): the 1983 claims for monetary damages raised against the defendants in their

official capacities; the claims for violations of 18 U.S.C. §§ 245, 247, and 249; the requests for a

declaratory judgment that the defendants violated Gawlik's federal constitutional rights in 2018

and 2019; the Eighth Amendment deliberate indifference to medical needs claim asserted against

Nurse Parker and Captain Watson; the Eighth Amendment claim related to the temporary

deprivation of outdoor exercise raised against Captain Watson and the requests for injunctive

relief associated with that claim; all claims raised against Connecticut State Trooper Mejias,

Connecticut State Trooper Lieutenant Ceruti, Connecticut State Trooper Detective Vayan, and

Commissioner Rovella; claims raised under 42 U.S.C. § 1985; all claims raised against the

defendants in their individual capacities under RLUIPA and claims seeking monetary damages

for violations of RLUIPA; all state-law claims raised against the defendants in their official

capacities; and the negligence claims and claims raised under sections 46a-71, 52-571a, 52-71c against the defendants in their individual capacities.

**(2)** The following claims are **DISMISSED** without prejudice: the Fourteenth Amendment due process claims raised against Lieutenant Czeremcha, Captain Watson, Officers Smith, Buckland, Brown, Parker, Cunningham, Commissioner Semple, Warden Erfe, Director Williams, and District Administrator Quiros; the First Amendment claims raised against Commissioner Semple, Warden Erfe, Director Williams, and District Administrator Quiros in their individual capacities; the Eighth Amendment use of excessive force claim against Captain Watson; claims raised under the Connecticut Constitution; and the claims raised against the defendants under section 52-71b, over which I decline to exercise supplemental jurisdiction.

**(3)** The following claims will **PROCEED**: (1) the Eighth Amendment excessive force claim asserted against Lieutenant Czeremcha and Officers Buckland, Brown, Smith, Parker, and Cunningham in their individual capacities; (2) the First Amendment free exercise claim asserted against Lieutenant Czeremcha, Captain Watson and Officers, Smith, Buckland, Brown, Parker, and Cunningham in their individual and official capacities and against Commissioner Semple, Warden Erfe, District Administrator Quiros, and Director Williams in their officials capacities to the extent that Gawlik seeks injunctive relief related to the claim; and (3) the RLUIPA claim asserted against Lieutenant Czeremcha, Captain Watson, Officers, Smith, Buckland, Brown, Parker, and Cunningham, Commissioner Semple, Warden Erfe, District Administrator Quiros, and Director Williams in their official capacities for injunctive and declaratory relief.

I will additionally exercise supplemental jurisdiction over the state law assault and battery claims raised against Officers Buckland and Brown in their individual capacities.

**(4)**     Because Gawlik paid the filing fee in this case, he is responsible for serving

the complaint on Lieutenant Czeremcha, Captain Watson, Correctional Officer Smith,

Correctional Officer Buckland, Correctional Officer Brown, Correctional Officer Parker,

Correctional Officer Cunningham, Commissioner Semple, Warden Erfe, District Administrator

Quiros, and Director of Religious Services Reverend Williams in their individual and official

capacities pursuant to Rule 4 of the Federal Rules of Civil Procedure. The Clerk is directed to

send Gawlik instructions for service of the complaint on these defendants in their individual

capacities, together with one copy of the complaint, [Doc. No. 1], one copy of this Order, eleven

blank Notice of Lawsuit forms and eleven blank Waiver of Service of Summons forms.

**(5)**     Within (30) thirty days of the date of this order, Gawlik shall effect service of the

complaint on Lieutenant Czeremcha, Captain Watson, Correctional Officer Smith, Correctional

Officer Buckland, Correctional Officer Brown, Correctional Officer Parker and Correctional

Officer Cunningham by mailing a Notice of Lawsuit form, a Waiver of Service of Summons

form, a copy of the complaint, and a copy of this order to each one of these defendants at his or

her work address.  Gawlik shall file a Notice with the Clerk indicating the date or dates on which

he mailed the Notice of Lawsuit and Waiver of Services of Summons forms to

each defendant. Gawlik shall also file the signed Waivers of Service of Summons forms that he

receives from the defendants with the Clerk.

Gawlik shall also effect service of the complaint on defendants Lieutenant Czeremcha,

Captain Watson, Correctional Officer Smith, Correctional Officer Buckland, Correctional

Officer Brown, Correctional Officer Parker, Correctional Officer Cunningham, Commissioner

Semple, Warden Erfe, District Administrator Quiros, and Director of Religious Services

40

Reverend Williams in their official capacities by serving a copy of the summons, complaint, and this order on the defendants using the address of the Office of the Attorney General, 165 Capitol Avenue, Hartford, Connecticut 06160.  **He shall also file a return of service documenting when the defendants were served with a copy of the complaint in their official capacities.**

**(6)**      Director Williams, Lieutenant Czeremcha, Captain Watson, Officers Smith, Buckland, Brown and Parker, Cunningham, Commissioner Semple, District Administrator Quiros, and Warden Erfe shall file a response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them by Gawlik.  If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include all additional defenses permitted by the Federal Rules.

**(7)**      Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within seven months (210 days) from the date of this order.  Discovery requests need not be filed with the Court.

**(8)**      All motions for summary judgment shall be filed within eight months (240 days) from the date of this order.

**(9)**      If Gawlik changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that Gawlik MUST notify the Court.  Failure to do so can result in the dismissal of the case.  Gawlik must give notice of a new address even if he is incarcerated. Gawlik should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Gawlik has more than one pending case, he should indicate all case numbers in the notification of change of

41

address.  Gawlik should also notify the defendants or the attorney for the defendants of his new

address.

**(10)**     Gawlik shall utilize the Prisoner Efiling Program when filing documents with the

Court.  Gawlik is advised that the Program may be used only to file documents with the Court.

Local Court Rule 5(f) provides that discovery requests are not to be filed with the Court.

Therefore, discovery requests must be served on defendants' counsel by regular mail.

**(11)**     The Clerk shall send a courtesy copy of the complaint and this order to the Connecticut

Attorney General and to the DOC Legal Affairs Unit. **The Attorney General and the**

**Department of Correction Legal Affairs Unit Shall preserve any video evidence of the**

**incident referenced in the complaint.**

**(12)**     The parties must comply with the District of Connecticut "Standing Order Re: Initial

Discovery Disclosures" which will be sent to the parties by the Clerk.  The order also can be

found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders.

So ordered.

Dated at Bridgeport, Connecticut, this 27th day of September 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

42